United States District Court

For the District of Puerto Rico

Eduardo Ramirez-Lizardi

Lucila Rodriguez-Cruz                    CIVIL NO. 23-cv-1069(SCC)

Plaintiff

Pro Se                          AND DEMAND FOR JURY TRIAL

v.

Mennonite General Hospital, Inc.

Hospital Menonita Caguas, Inc.

Sistema de Salud Menonita

Ricardo Hernadez-Rivera, and his

Property legal partnership, profit

Edgardo Cartagena Ayala, and his

Property legal Partnership profit

Guillermo Pastrana Arzola, and his

Property Legal Partnership Profit

Eric Perez Carrasquillo, and his

Property Legal Partnership Profit

1

Hospital Menonita Caguas, Inc., Governing body,

Each, in his own legal capacity, and their

Own Property Legal Partnership Profit

Defendants

-------------------------------------------------------------------------

## COMPLAINT

I. Names and Directions

Eduardo Ramirez-Lizardi, MD

PO Box 6717

Caguas, Puerto Rico 00726-6717

Cell Phone: (787) 565-6380

E-Mail: centerforbreastdiseases@gmail.com

Lucila Rodriguez-Cruz

PO Box 6717

Caguas, Puerto Rico 00726-6717

Cell Phone: (787) 462-2293

Plaintiff, Pro Se

VS

Mennonite General Hospital, Inc.

PO Box 1650

Cidra, Puerto Rico   00739-1650

Hospital Menonita, Caguas, Inc.

PO Box 6660

Caguas, Puerto Rico 00726- 6660

Telephone: (787) 653-0550

Sistema de Salud Menonita

PO Box 1650

Cidra, Puerto Rico 00739- 1650

Ricardo Hernandez-Rivera, CPA, CEO

Sistema de Salud Menonita

PO Box 1650

Cidra, Puerto Rico 00739-1650

And his Property legal partnership profit

(Call her Jane Doe I. As soon we know her name

Will replace it).

Edgardo Cartagena-Ayala, MD, Medical  Director

Hospital Menonita, Caguas, Inc., and

His Property legal partnership profit.

(Call her Jane Doe II. As Soon we know her name,

Will replace it).

PO Box 6660

Caguas, Puerto Rico, 00726-6660

Telephone: (787) 653-0550

Guillermo Pastrana-Arzola. MHSA

Hospital Menonita Caguas, Inc. Administrator

And his Property legal partnership profit.

(Call her Jane Doe III. As soon we know her name

Will replace it).

PO Box 6660

Caguas, Puerto Rico, 00726-6660

Telephone: (787) 653-0550

Eric Perez-Carrasquillo, MD, President,

Medical Staff, Hospital Menonita Caguas, Inc.

And his Property legal partnership profit

(Call her Jane Doe IV. (As Soon we know her name

 Will replace it).

PO Box 6660

Caguas, Puerto Rico, 00726-6660

Telephone: (787) 653-0550

Hospital Menonita Caguas, Governing Body.

Each, on his own legal capacity, and their

Own Property legal partnership profit.

(Call them Jane, and John Doe. As soon we know their names

Will replace them)

PO Box 6660

Caguas, Puerto Rico, 00726-6660

Telephone: (787) 653-0550

Defendants

---

Complaints

Stament of Jurisdiction

1) Fourteenth Amendment of the Constitution of the United State of America: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

2) Both Corporations are nonproft, tax exempts under the IRC 501(c)(3). Both, also receive funds by the Federal Government. (1). They also have contracts with Federal Programs and receive profit from them, such as Medicare and Medicaid. They must abide by the CMS, Joint Commission, and the AMA codes, and jurisdiction. They must follow due process, fair hearings, anti- discriminations policies, including AGE.

3) HHS Civil Rights Offices (OCR). OCR investigate complaints that allegate discrimination. OCR conducts ''compliance reviews'' to determine if policies, procedures and actions of covered entities are consistent with civil rights laws. OCR can investigate complaints that fall within its jurisdiction. The complaint must describe one or more discriminatory actions, policies, or procedures. If OCR determines that a complaint is against an entity over which OCR has jurisdiction, OCR will notify the complainant and the covered entity. Covered entities are required by law to cooperate with complaint investigations. If the evidence indicates that the covered entity was not in compliance with the applicable regulation or law, OCR will attempt to resolve the case by obtaining corrective action through a voluntary agreement with the covered entity. If the covered entity does not take voluntary action to resolve the matter in a way that is satisfactory, OCR may include referral to the Department of Justice for enforcement action; steps to terminate Federal financial assistance to the covered entity; or other acttions

Stament of Jurisdiction

1) Fourteenth Amendment of the Constitution of the United State of America: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.[1]

2) Both Corporations are nonproft, tax exempts under the IRC 501(c)(3). Both, also receive funds by the Federal Government. (1). They also have contracts with Federal Programs and receive profit from them, such as Medicare and Medicaid. They must abide by the CMS, Joint Commission, and the AMA codes, and jurisdiction. They must follow due process, fair hearings, anti- discriminations policies, including AGE.

3) HHS Civil Rights Offices (OCR). OCR investigate complaints that allegate discrimination. OCR conducts ''compliance reviews'' to determine if policies, procedures and actions of covered entities are consistent with civil rights laws. OCR can investigate complaints that fall within its jurisdiction. T[2]he complaint must describe one or more discriminatory actions, policies, or procedures. If OCR determines that a complaint is against an entity over which OCR has jurisdiction, OCR will notify the complainant and the covered entity. Covered entities are required by law to cooperate with complaint investigations. If the evidence indicates that the covered entity was not in compliance with the applicable regulation or law, OCR will attempt to resolve the case by obtaining corrective action through a voluntary agreement with the covered entity. If the covered entity does not take voluntary action to resolve the matter in a way that is satisfactory,

---

[1] Section 1331, Title 28 of the United States Code is the general federal question jurisdictional statute, which grants federal district courts with original subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the Uniteed States."

4) Violation of the .U.S.: Equal Employment Opportunity Commission (EEOC).

5) Violation of antitrust laws: Agreement by competitor to refuse to deal with particular entities are known as ''group boycotts'' and deemed to be violations of Section 1. Section 2 of the Sherman Act prohibits monopolization, attemps to monopolize, and conspiracies to monopolize. The FTC Act, enacted ''unfair methods of competition''.

6) Work harassment based on discrimination due to Age

7) Defamation, Libel.

8) Kickback, bribe

9) Breach of contract

10) Reduction, demotion of my privileges without a hearing and due process, and violation of the Federal institutions, and agencies, and the Medical Staff Bylaws of Hospital Menonita Caguas.

11) Violation of the Medical Staff Bylaws, Hospital Menonita, Caguas, inc.

12) Forgery

13) Tort Law


Allegations

1.  My name and direction are the same as previous stated. I am married, USA citizen, Place of birth in San Juan, Puerto Rico. Live in Caguas, Puerto Rico. I submitted my Curricullum Vitae as exhibit #1.

2. I am doing general surgery since I finished my Medical School training, about 45 years ago (from head to toes). I was the first General Surgeon in Puerto Rico to do all kind of surgical procedures during the 80´s, and 90´s periods. No other general surgeon would do that, because of the numerous specialties, and sub-specialties that are now.

3. I was the chairman or Chief Department of surgery at several hospitals, and being an instructor to internal, and resident physicians, as well as students from UPR school of Medicine and San Juan Bautista School of Medicine. The first time Caguas Regional Hospital passed the revision of Joint Commission with excelent recommendations for the Department of Surgery. Also Director of Intensive Care Unit, Surgery Endoscopy Section, Director of Nutrition Committtee. Founder, and President of Special Nutrition Program at HIMA hospital. Director of surgical Intensive Care Unit, Wrote the Manual, Rules and Regulations of SICU Department.

4. Board Eligible in Surgery. Presented several Lectures at universities, Hospitals, communities Center, Medical Professionals, and Puerto Rico Society of Senology. Several Publications and papers. Special appearances in local tv and radio programs

5. Member of such distinguished institution as the New York Academy of Science, American Academy for the Advancement of Science, American Society for Parental and Enteral Nutrition. Society of Laparoendoscopic Surgeons, Member, Board of Directors, Sociedad Puertorriqueña de Senología.

6. Educational Seminars: Endoscopies courses, Laparoscopic Cholecystectomy. Laparoscopic Appendectomy, Small Bowel and Colon Resections (one of the first three, Puerto Rico surgeons who train in these procedures). Techniques of Flexible Sigmoidoscopy, Colonoscopy, and Endoscopic Polipectomy (teaching under the

guidance of the inventor of Polipectomy: Surgeon Hiromi Shinya), Techniqques of Flexible Esophagogastroduodenoscopy (also by Dr. Shinya).

7. Research: DNA Repair in Breast Cancer. Ponce School of Medicine and Moffit Cancer Center.

8. Member of Puerto Rico Cell Bank.

9. Other: Conference participant (the only from Puerto Rico), National Institute of Health (NIH), National Cancer Institute (NCI), Consensus Development Program. Diagnosis and management of Ductal Carcinoma In Situ. Bethesda, MD.

10. Other:Independent Medical Examiner(IME), Expert Witness

11. Teaching Surgeons on Sentinel Lymph Nodes, Stereotatactic and Sonography guidances Biopsies.

12. Medical Examiner (3th part), appointed by Tribunal Examinador de Médicos

13. Participant in multiples Tumor Board Presentation.

14. Exhibits #2 Hospital Menonita Caguas, Medical Staff Bylaws

15. Exhibit #3 Medical Licence by Tribunal Examinador de Médicos

16. Exhibit #4 Certification of Specialty in General Surgery

17. Exhibit#5 Certification issued by The New York Academy of Sciencce as an Active Member

18. Exhibit #6 Certificate of Completion in the Laparoscopic Bowel and Colon Procedures Course (Hands-on).

19. Exhibit #7 Certificate of the Laparoscopic Cholecystectomy Course for Surgeons (hands-on).

20. Exhibit #8 Certificate as been elected for Membership in The Society of Laparoendoscopic Surgeons.

21. I have two offices (not in use now due to the tremors in December 2019, and january 2020) in Ponce, Puerto Rico (they are my main offices since aproximately 25 years). I live in Caguas and had been going to Ponce every day 24/7. I decided to come to Caguas to start a surgical practice and decrease slowly my practice in Ponce until I develop a good practice in Caguas.

22. I spoke with Dr. Edgardo Cartagena, Medical Director of hospital Menonita Caguas, and with Mr.Rogelio Díaz MHSA, Hospital Menonita Caguas Administrator, to whom I know previously. We discuss our interests (I think in January 2014) and they (both) told me that they can gave me privileges at the hospital with one condition, and that was that I had to participate in the ON-CALL roster of the Department of Surgery every month. I accepted the agreement, and after they verify all my credentials, the Governing Board approved my request and became as staff member on May 27th, 2014 with all my requested privileges, and started on-call duties as our previous contract, agreement, and the Medical Staff Bylaws, as bindings with the Governing Body.

23. My practice is not growing. I had to rent a space with all inclusive to Dr. Cartagena. The rent was very high, for half a day in the week (Thursday), the same day that I made surgeries at operating room and was on-call. The problema was that the secretaries paid by Dr. Cartagena never answer the phones, several patients told me. I discuss the problem with Mrs Diana Cartagena, the office administrator, that was the sister of Dr. Cartagena. Sometimes I had no patients and neither the next week. I spoke again with the office administrator and told her that I decided to go elsewhere because the problem

10

continue. She made some discount to my rent but the problem continue. My only income was through the on-call duties.

24. During the first trimester of 2021 the hospital decided to move the offices from that area and rent other offices at an attachment building. All the physicians that rent a space with Dr. Cartagena Passed en-block to the new facilities. I was not invited to joint them.

25. On April 12th, 2021, my wife and I went to saw Mr. Guillermo Pastrana, Hospital Menonita Caguas Administrator.He was at his office but his secretary Ms. Carmen, told us that he was not available. I told her that I needed to see him in a hurry, so I can wait until available. My wife and I got sitted on a loveseat. He came outside his office and with an agressive attitud toward us, in front of all the employees of administration, standing in front of us without the consideration or respect to us, questioned me why am I there. I stood up, and without shacking our hands, as a sign of respect.I asked him if he had an empty office to rent me or borrowed me a space inside the hospital to see my patients. He, in an agressive tone, said to me that he did not have any space or office to rent  or borrow to me. He had one office left with a rent of five thousands dollars ($5,000.00) monthly, without any furniture, equipment, secretary or nurse, Totally empty. I said that I did not have that money for rent. Then he explained, that if, otherwise, I did not have money or anyone to rent me a space, I know what I may do. (my wife and I, both, understood that he means that I had to go out of the Hospital). I talked with Dr. Jorge Cordero, Chief Department of Surgery of the same Hospital, and he told me that he wont´t let me down. Cordero rent an office with only one space, I decided with him to start every Friday seen my patients. My wife is a retired nurse and help me with the patients. I used my phones, and all my offices stuff, including papers,

gowns dressings,  whatever we need in an office. Also clean the office before we left it. The only think that I used from him was his photocopy, but the paper I used was mine.We never talk about money or rent, but I said that I was going to paid him, and started paying. My patiences from Ponce came to visit me there, also from other cities or towns around Puerto Rico. My practice began to growth slowly, and with my on – call duties I can handle better.my economic status.

26. I had my Schedule of on-call services from August 2021 with fourth (4) on-call days. On August 11, 2021, Dr. Cordero notified me that my on-call days was remnoved by Dr. Edgardo Cartagena, Medical Director of the hospital, because they had three (3) new, Young graduate surgeons that wanted to do five (5) on-call days, each one. And if I had any question, asked Dr. Cartagena. I called Dr. Cartagena to his cellphone, and texted him, but never answered. Also went on multiple occassions to the administrative Department to see him, but he was never available. I did the same with Mr. Pastrana, Administrator with the same results. They tried to evade me. Whenever they saw me, they hide. When I saw them I called by their names but never stopped to talk to me. I wanted an explanation why Dr. Cartagena, on behalf of the Governing Body, and CEO, and hospital administration removed me from my contract with the Hospital and the Medical Staff Bylaws without just cause or gave me a hearing or due process, stated at the Medical Staff Bylaws. I am showing the ´´Programa de Guardia, Departamento de Cirugía´´ from August 2021 As exhibit # 9.

27. On November 2nd. 2021 I wrote a letter, and sent by certified mail, to Mr. Ricardo Hernandez, CEO Sistema de Salud Menonita that explained more or less what I am saying. Exhibit #10 (I have written in spanish, but as son as I know whom their counsel

will be, I can agree with him, if your Honor approved first, to let me translate the letters, because I have no money to pay for a translator. These are letters that I sent to them, and they sent to me. It´s easy to corroborate the translation because both parties have the same letters. Any comment or objection on their side we discuss it and make arrangement to correct it, if apply.)

28. On December 17th, 2021 I wrote two different letters one to Dr. Cartagena, Medical Director, and the other to Mr. Guillermo Pastrana, Hospital Administrator, asking them to meet me to discuss why they removed me from my on-call agremment. The one that belongs to Dr. Cartagena may be Exhibit #11, and the one to Mr, Pastrana, Administrator, Exhibit #12. (both written in spanish, and waiting for the decisión of the Honorable Judge to let me translate them).

29. Dr. Cartagena, and Mr Pastrana, acting on behalf of the Governing Body and the CEO Mr.Hernandez, removed my name from all Directories, Bulleting Boards, Boards placed in front of the elevators, and the new offices. Marked as Exhibit #13 the old Medical Directory, and with Exhibit #14, the new Offices Medical Directory without my name on it.I placed besides theses new Directories, my new office number and information.They removed some, but I kept posting new ones. This will be Exhibit #15.

30. I continue calling, texting, and going to Administration Department continuosly to arrange a meeting with both of them (Cartagena and Pastrana) with no answers.

31. During the last days of January 2022 I had a reunion at the office of Dr. Cartagena; with him and Dr. Eric Perez, Medical Staff President of Hospital Menonita Caguas, as his wittness. I Convoked the reunion with the intervention of Mr. Pastrana, Hospital Administrator, because nobody could give me a reason for my removal from my on-

call duties, previously contracted when I accepted to be part of the Medical Staff of the present hospital (breach of contract); .during that reunion they did not give me any explanation for my removal of my on-call duties, and replaced me with three (3) Young graduate surgeons. That time, Dr. Cartagena offered me a position of the Utilization Review assessor with a pay of fifteen hundred dolars ($1,500.00) monthly, plus two (2) on-call duties. During the first week of February 2022 we, Dr. Cartagena and I (only both of us) had another reunion, he told me that the hospital denied our request  and that they approved only one thousand dollars ($1,000.00) but as assessor of the transfussion committee. ´´Take it or leave it. That is´´ I told him to call Mr. Pastrana, hospital administrator to aprove the ofert. He said that he had the authority to do it. They know my precarious monetary situation, and I accepted it with the condition to gave me three (3) on-call duties; but my name was not on March 2022, roster. Due to the above, I requested a meeting with Dr. Cartagena, Mr. Pastrana, and Ms. Lebron, Financial Management of the hospital.; also they removed me from my first operating room time to gave it to the three new young graduates surgeons (they made surgical procedures at the same time, on the same patient, the three of them).This letter belong to March 11, 2022. (pending approval to translate).Exhibit #16.

32. On February 25th, 2022 I wrote a letter, Exhibit #17 to Dr. Cartagena, inquiring about my payment of Frebruary 2022, as assessor of transfusion committee. I needed the money to pay my malpractice insurance. Ms. Carmen, secretary of Administration, told me that I did not have a contract, and they need my commerce registry, and then, the hospital counsels may redact a contract. May be a delay of about two to three weeks. I told her that this is a breach of contract between Dr. Cartagena, the Administrator, Ms.

Lebron and the Governing Body, including the CEO Mr. Hernandez. I, also spoke that same day with Ms. Lebron About it.

33. On February 28th, 2022 I sent to Dr. Cartagena my inform as assessor of Blood Transfusion as our agreement. Exhibit #18. (pending translation as previous).

34. Dr. Edgardo Cartagena, medical Director, Hospital Menonita Caguas, sent me a letter dated March 23th, 2022, Exhibit #19 (pending translation as previous). He stated that the on-call roster of all Department in the Hospital are a coordinated work between the Chief of the Department and the Medical Director (him). He also cite or quotes Article 13.10.2.5.9 of the Medical Staff Bylaws. In our Department, the chief of the Department or Sections are who prepare the monthly on-call list without the intervention of the medical director. Dr. Cartagena, also stated that due to the new advances in surgical procedures, including laparoscopic procedures, and continue saying that thoses procedures are news, and because I do not do laparoscopic procedures (he is saying that theses procedures are news, and that I do not do them, implying that I am old. It is the first time that he recognised my discrimination due to aging.). And continue saying that the hospital have other resources that do the laparoscopic procedure, and because of that he as Medical Director removed me from doing on-call duties.

35. Dr. Cartagena forgot that during our meeting in January, 2022, he and Dr. Eric Perez, Medical Staff President, commented that the three new Young graduate surgeons do not known how to do laparoscopic procedures. He also, stated that the three of them always be in the same surgical case. Dr., Cartagena mentioned (one case) that the three started a laparoscopic appendectomy, and after four hours (4) of trying to remove the

15

appendix, had to open the patient; and that in a laparoscopic cholecystectomy they had six (6) hours of procedure, and decided to open the abdomen, they open the abdomen and placed a catheter inside the gallbladder instead to remove it. And Dr. Cartagena, laughing said that it is because they had no practice. I told Dr. Cartagena that they most be monitoring, before killing several patients, practicing on them. Dr. Cartagena know that I perform almost all my cases at operating room by laparoscopy. And had done more than two thousands (2,000) laparoscopic procedures. My proof that I was one of the first three surgeons in Puerto Rico to perform all kind of laparoscopic procedures. See exhibits #1,6 and 7. Also the three new Young surgeons had been trying to do an open thyroidectomy and after six (6) hours of procedure they could not identified the thyroid gland. The anesthesiologist had to call Dr, Cordero, Chief Department of Surgery, to help them identified the gland.

36. During that meeting with Drs. Cartagena, and Perez, Dr. Cartagena told Dr. Perez that he gave more money to one of the Young surgeon (it was a Lady), because of her productivity. ( Kick-back?).(admissions, surgeries, and consults).

37. May 14th, 2022 I wrote a letter to Dr. Eric Perez, Medical Staff President.Exhibit #20.I stated that had been imposible for me to contact Dr. Cartagena or Mr. Pastrana to get an arrangement to solve it friendly, Dr. Perez  knows what´s going on. Due to this problem I invoked   Article IX of the Medical Staff   Bylaws, ''Collegial Intervention''and, due to ítems 9.1.1.2, Dr. Perez as President of the Medical Staff, may appoint an ad hoc committee of the Medical Staff to review my case, and produce an inform as soon as posible. I, also wanted Dr. Perez to remember that they never read me my rights, hearing procedure, and gave me a due process.

38. I received a letter sent by Dr. Eric Perez, Medical Staff President, dated June 16th, 2022 with the same theory as Dr. Cartagena, like a copycat. Exhibit #21 (as soon I receive the approve, I will Translate).

39. On June 23th, 2022, I sent a letter to Dr. Eric Perez in replay to his (dated June 16th, 2022). Exhibit #22 (I do not have to translate, because I wrote in english). It stated that As per article XIII (Page 179) of the Medical Staff bylaws Item 13.10 (page 186) Hospital Medical Director: Subsection 13.10.1 (page186) Appointment of the Hospital Medical Director: ...Shall be appointed by the GB. Item: 13.10.2: (page186) Duties and reponsibilities of the Medical Director:"shall have the prerogatives and responsibilities recognized and assigned to him by the GB through the Corporate Bylaws and also include the following: 13.10.2.5.9: (page188 of the Medical Staff Bylaws): "Request each Department Chair to prepare a monthly on-call list for all Sections of the Department".

40. Article V: Medical Staff Categories Recognitions. Item: 5.4.3 (page57): Responsibilities: Each member of the Active Staff shall: Sub-Item: 5.4.3.1: Discharge the basic responsibilities set forth Article III of these Bylaws, including being available for "on-call" duty for the Emergency Room and to answer consultations from other Departments, units or Section of the Hospital. (page 57). That is what I am saying all the time. The Medical Director acting on behalf of the GB, CEO, and also the President of The Medical Staff, all of them were in violation of the Medical Staff Bylaws.

41. In that same letter (June 23th, 2022),(Exhibit #19) I also, stated to the Medical Staff, President, Dr. Eric Perez,that I requested him, as the President of the Medical Staff to proceed with a Collegial Intervention as seth forth in Article 9.1;

42. As I previous stated,  the Medical Director is appointed by the GB, and the CEO; and may follow the Corporate Bylaws, which we, as staff, do not have. It is an unilateral disposition.  From which, us, as Medical Staff have no inference, nor participation redacting it. He is not a member of the Medical Staff as a Medical Director.

43. Item 9.1.1.2 of the Bylaws of the Medical Staff (Collegial Intervention: "Prior to initiating a corrective action against a Practitioner for…competency concerns, the Medical Staff leader or GB (through the CEO or his designee) may elect to attempt to resolve the concern(s) informally"  (page 130).

44. Due that Dr. Perez, Medical Staff Director, Refused  to request such Collegial Intervention; I requested to him be referred to the MEC as per Article 9.1.1.3: "If the President of the Medical Staff, the Department Chair, the HospitalAdministrator and/or the ad-hoc Medical Staff Committee (as applicable) is unable to resolve the issue(s), the matter should be referred to the MEC (Medical Executive Commitee) for the initation of a formal corrective action." (page 130). (of the medical staff bylaws).

45. My grounds to invoke the MEC are against Dr, Cartagena, Medical Director, acting on behalf of the GB, CEO, and others, A,B,C,D. The violations are:

1. Violation of Article 4.1.4: Non Discrimination: "…shall not be denied on the basis of gender, AGE (emphasis supplied)…" (Page 37)

2. Violation of this Article 5.4.2.4: "To exercise such clinical privileges as are granted to him." (Page 57)

3. Violation of this Article 5.4.2.5: "To have priority on bed availability, Operating Room Time and facilities on elective patients, Over Any Member Under Any Other Category Of The Medical staff." (Page 57).

18

4. Violation of this Article 11.1.4.8 (grounds for hearing by the MEC or GB): "Reduction or curtailing of Current Clinical Privileges". (Page 147).

5. Violation of this Article 9.2.1, 9.2.1.6: "Whenever the… profesional (sic) or personal conduct is considered to be": "Unethical as defined by the… Or other entity:". (Dr. Cartagena in junction with the Administration and on behalf of the GB, the CEO, as their representative). (Page 131).

6. Violation of Article 2.69: "Unprofessional Or Inappropriate Behavior". (Page 31).

46. Dr. Cartagena sent me a letter last March 23th, 2022, (Exhibit #19) he stated that his sole responsibilities is to assure an optimal level of services to the patients, and with the most recents and standar techniques. He also said that laparoscopic surgeries are new procedures (He is completely wrong, that is ridiculous, mindless, mind-boggling, or a memory lapse from its contain). This aseveration needs an immediate review of his capacity as a Medical Director, and as Medical Staff physician AS SOON AS POSSIBLE, by the GB, CEO. I will elicit more at the trial.

47. Article 6.13.1 "Each CHAIR of the Department for which the Applicant is seeking Clinical Privileges shall evaluate the application, supporting documents, and any other available information that is deemed pertinent to make a recommendation regarding Staff Category, Departmental affilliation, and Clinical Privileges requested."(page85).

48. Article 6.13.2 "the evaluation of Medical Staff and Clinical Privileges aplication is the prerogative of the Chair of the Department who will make the final departmental decision and will provide the Credentialing Committee with the Department recommendation." (page85).

49. OTHER EXHIBITS, FOOTNOTES, AND LEGAL CASES:

50. Article VI: Staff Membership; ítem: 4.1.4 (Medical Staff Bylaws). Page #37: Non Discrimination:…Medical Staff Membership and/or Cinical Privilegess shall not be denie on the basis of… age…. Exhibit # 23.

51. Non Discrimination On The Basis of AGE In Programs Or Activities Receiving Federal Financial Assistance: Title 45, last amended 03/17/2022.: Part 90. (a) the Age Driscrimination act applies to any program or activity receiving Federal financial Assistance, including programs or activities receiving funds under the State and Local fiscal assistance Act of 1972 (31 U.S.C. 1221 et seq.). Exhibit #24.Title 45: Public Welfare. Department of Health and Human Services.

52. (90.11, 90.12) Rules against age discrimination: The purpose of this subpart is to set forth the prohibitions against age discrimination.

53. (a) General rule: No person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance.

54. (b) Specific rules: A recipient may not, in any program, or activity receiving Federal financial assistance, directly or through contractual, licensing, or other arrangements use age distinctions or take any other actions which have the effect, on the basis of age, of: (1) Excluding individuals from, denying them the benefits of, or subjecting them to discrimination under, a program or activity receiving Federal financial assistance,or (2) Denying or limiting individuals in their opportunity to participate in any program  or activity receiving Federal financial assistance.

55. 42 U.S.C. 1986- U.S. Code- Unannotated Title 42. The Public Health and Welfare, 1989. Action for neglect to prevent. Exhibit #25:

56. Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. Exhibit: #26.

57. 42 U.S.C. 1983- Code- Unannoted Title 42.  The Public Health and Welfare 1983. Civil action for deprivation of rights. "every person  who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or the immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"Exhibit #27.

58. U.S. Department of Health and Human Services: Assurance of Compliance: The applicant hereby agrees that it will comply with: (4) The Age Discrimination Act of 1975, as amended (codified at 42 U.S.C. 6101 et seq.). and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 91), to the end that, in accordance with the Act and the Regulation, no person in the United States shall, on the basis of age, be denied the benefits of, be excluded from participation in, or be subjected to discrimination under any program or

21

activity for which the Applicant receives Federal financial assistance from the Department. Exhibit #28.

59. U.S. Department of Health & Human Services. "How OCR Enforces Civil Rights Discrimination Laws and Regulations":"One of the ways that OCR carries out its enforcement responsibilities is to investigate complaints that allege discrimination."

60. "OCR must have enforcement authority over the covered entity (e.g; hospital, doctor, adoption agency, etc.)." Exhibit #29.

61. "If the covered entity not take voluntary action to resolve the matter in a way that is satisfactory, OCR will issue a Letter of Findings that describes how the covered entity is not in compliance and identifies next steps, which may include referral to the Department of Justice for enforcement action: steps to terminate Federal financial assistance to the covered entity: or other actions." Exhibitts #29. (two pages).

62. EEOC (Inquiry) Number: 515-2022-00467. "Inquiry Information" Exhibits #30 (two pages). `

63. American Medical Association (AMA): Physician and Medical Staff Member Bill of Rights H-225,942 (Year Last Modified: 2021). "Our AMA adopts and will distribute the following Medical Staff Rights and Responsibilities":

64. Preamble: "The organized medical staff, hospital governing body, and administration are all integral to the provision of quality care, providing a safe environment for patients, staff, and visitors, and working continuosly to improve patient care and outcomes. They opérate in distinct, highly expert fields to fulfill common goals, and are each responsible for carrying out primary responsibilities that cannot be delegated.

65. The organized medical staff consists of practicing physicians who not only have medical expertise but also possess a specialized knowledge that can be acquired only through daily experiences at the frontline of patient care. These personal interactions between medical staff physicians and their patients lead to an accountability distinct from that of other stakeholders in the hospital. This accountability requires that the physicians remain answerable first and foremost to their patients.

66. Medical staff self-governance is vital in protecting the ability of physicians to act in their patients' best interest. Only within the confines of the principles and processes of self-governance can physicians .ultimately ensure that all treatment decisions remain insulated from interference motivated by commercial or other interests that may threaten high-quality patient care.

67. AMA recognizes the following fundamental responsibilities of the medical staff:

68. :1) to provide for the delivery of high-quality and safe patients care, the provision of which relies on mutual accountability and interdependence with the health care organization's governing body.

69. 2) to provide leadership and work collaboratively with the health care organization's administration and governing body to continuously improve patient care and outcomes, both in collaboration with and independent of the organization's advocacy efforts with federal, state, and local government and other regulatory authorities.

70. 3) To participate in the health care organization's operational and strategic planing to safeguard the interest of patients, the community, the health care organization, and the medical staff and its members.

23

71. 4) to establish qualifications for membership and fairly evaluate all members and candidates without the use of economic criteria unrelated to quality, and to identify and manage potential conflicts that could result in unfair evaluation.

72. 5) to establish standards and hold members individually and collectively accountable for quality, safety, and profesional conduct.

73. 6) to make appropriate recommendations to the health care organization's governing body regarding membership, privileging, patient care, and peer review.

74. The following Fundamental Rights of the Medical Staff are Essential to the Medical Staff's ability to Fulfill its Responsibilities:

75. 1) the right to be self-governed, which includes but is not limited to (a) initiating, developing, and approving or disapproving of medical staff bylaws, rules and regulations, (2) selecting and removing medical staff leaders, (3) controlling the use of medical staff funds, (4) being advised by independent legal counsel.

76. AMA recognizes the following fundamental rigths apply to individual medical staff members regardless of employment, contractual, or independent status, and are essential to each member's ability to fulfill the responsibilities owed to his or her patients, the medical staff, and the health care organization:

77. 1) to exercise fully the prerogative of medical staff membership afforded by the medical staff bylaws.

78. 2) to make treatment decisions, including referrals, 24Case done to the best interest of the patient, subject to review only by peers.

79. 3) to exercise personal and profesional judgement in voting, speaking, and advocating on any matter regarding patient care, medical staff matters, or personal safety, including

the right to refuse to work in unsafe situations, without fear of retaliation by the medical staff or the health care organization's administration or governing body, including advocacy both in collaboration with and independent of the organization's advocacy efforts with federal, state, and local government and other regulatory authorities.

80.4) The right to be evaluated fairly, without the use of economic criteria, by unbiased Peers who are actively practicing physicians in the community and in the same special Specialty.

81.5) The right to full due process before the medical staff or health care organization takes adverse action affecting membership or privileges, including any attempt to abridge membership or privileges through the granting of exclusive contracts or closing of medical staff departments. Exhibit #30 (two papers)

82.6) The right of Access to resources necessary to provide clinically appropriate patient care, including the right to participate in advocacy efforts for the purpose of procuring such resources both in collaboration with and independent of the organization's adv ocacy efforts, without fear of retaliation by the medical staff or the health care organization's administration or governing body..

83) "Supreme Court of the United States: Fischer V. United States:"Certiorary to the United States Court of Appeals for the Eleventh Circuit."

84) Petitioner, while president and part owner of Quality Medical Consultants, Inc. (QMC), negociated a $1.2 million loan to QMC from West Volusia Hospital Authority (WVHA), a municipal agency responsible for operating two florida hospitals, both of

which participate in the federal Medicare program. In 1993 WHVA Received between $10 and $15 millions in Medicare funds.After a 1994 audit of WHVA raised questions about QMC loan, petitioner was indicted for violations for the federal bribery statute, including defrauding an organization which receives benefits under a federal assistance program, 18 U.S.C. 666(a)(1)(A), and paying a kickback to one of its agent, 666(a)(2). A jury convicted him on all counts, and the District Court sentenced him to imprisonment, imposed a term of supervised reléase, an ordered the payment of restitution." Exhibit #31 (two pages).

85) Defamation: is a public communication that tends to injure the reputation of another. It includes both libel (written defamatory statements) and slander (oral ones). It refers to a false statement presented as fact and made to a third party. The false statement must cause some type of actual damage. If it does, the written of this falcity can pursue a defammation lawsuit in civil court to obtain monetary compensation for loss economic opportunities, medical bills, or pain and suffrering. In Some courts; to prove "prima facie"defamation, a plaintiff must show four things: 1) a false statement purporting to be fact; 2) publication or communication of that statement to a third person; 3) fault amounting to at least negligence; and 4) damages, or some harm caused to the reputation of the person or entity who is the subject of the statement.

86.) Dr. Cartagena, Medical Director, hospital menonita Caguas, acting on behalf of the CEO, governing body, and administration, commited libel against my person.

87.) Harassment: Dr. Cartagena, on several occasions, one of them was many years ago, when one of my patient, hospitalized, needs a procedure that the hospital do not provide. I call one of my fellow physician in the community, (Gastroenterologist) who is the only in Caguas that do the procedure. I made arrangement to send patient to his hospital to do

the procedure, and then I will received her back. The social worker who was helping me with the transfer, told me that the Medical Director, and the administrator refused to pay the Gasroenterology to do the procedure. (I don't know the amount of money involved. The patient had a private health insurance. The days continue to pass, and the patient waiting for the gastroenterologist intervention, so I can proceed with a laparoscopy procedure. This is the "standard of care", I wrote all of the steps I am doing to resolve patient's problem ASAP. In the "HER", Electronic Health Record. I don't know how Dr. Cartagena knows what I wrote, but he cited me at his office at the administration department, and start harassing me for wthat I wrote, and that the hospital and them will be liable. I told him that, although I follow the medical staff bylaws, my priorities are my patients; and that I will do anything to provide them with the care they need. (Please see: paragaphs 64, [page 22], paragraphs 65-68, [page 23], paragraph74-76 [page 24], paragraphs 80.4-82.6 [page 25], paragraphs 76, 78.2 [page 24]. Dr. Cartagena, and the hospital administrator told me, in an aggressive attitude, that what I am doing is wrong and will be against my evaluations, and relations with the hospital. We made an agreement that I erase the notes and they would paid the gastroenterologist for the procedure. That same day the procedure was performed, and the next day I took patient to operating room to remove her gallbladder by Laparoscopic Cholecystectomy. Discharge Home without any complications.

88.) Another harassment was with Mr. Pastrana, hospital administrator, which I already explained when asking him about a space or office in the hospital. Paragraph 25 (April 12th, 2021), page (11).

89.) I am a cancer patient. I underwent a radical laparoscopic prostatectomy at Centro Medico Episcopal San Lucas, at Ponce. August 30th, 2017, they discharge me Home two days latter, but on September 7th 2017, I was admitted, again, to the hospital, due to a massive internal bleeding, almost dying. To ICU, and having more than 16 physicians treating me (thanks God to them). I was stable but they decided to discharge me two days before the arrival of Hurricane Maria. I was doing well, improving, until 2021 that I decided to perform a test, who showed that the cancer was increasing to growth. I received 30 plus radiotherapy, on a daily basis Working days. That did not precluded me to do my job at the hospital. I told the administration, DR. Cartagena, and Mr. Pastrana; The chief Department of Surgery, Dr. Cordero; the Nurse administrator of operating room, Mrs. Wilnelia Delgado, and the chief of the Operating Room, Dr. Adalberto Aviles. When I had elective Surgeries, I programmed them, to do after my radiation therapy on that day. As a Senior Active Member on staff; I had the privileges to schedule my surgeries on the day I requested, and at first time or hour in the schedule.

90.) I had being out of the hospital about two weeks because I had no patient for surgery             All of the operating room know it, that I am going to be out. Neveverrtheless,   MsWilnelia Delgado, Operating room Nurse Supervisor, without my authorization,        or asking me before, broke the padlock of my lockers (three) at the mens' dressing room           inside the        operating room.

91. I had three lockers, because the operating room is crowded. When I started at hospital in 2014 they did not had any locker to borrow me. They got Three (3) small lockers (half the wide, deep, and high of the conventional lockers that are there at the mens'

dressing room). Because they are too small, they gave me three (3) of them.  When I reached the dressing room, and saw my padlocks broken, I went to Mrs. Delgado to ask her what happened. She told me that a computer, that it only can be used by orthopedia surgeons, and their assistance with an instrument that can only function with orthopedic instruments was stolen. I told her, that I am not an orthopedic surgeon, and never used that device, and more important, she know that I was not there when the incident discovered. Also said that all of them had my phones number, offices, and cellphone and can call me anytime. They know that I answer always. She told me that was the order of Mr. Pastrana, hospital administrator. I said that I was going to call the police, and called Mr. Pastrana, And Dr Cartagena. To discuss the incident. I was very nervous and angry. I had to cancel the procedure that I was going to do at operating room, I explained  the patient, and she agree with me to be re-schedule other day. When I was waiting for the police to come to see with me the inside of my lockers, Dr. Cartagena, came to the operating room, and with an aggressive attitude started to shout out in front of me. I was sitted, and nervous, and he continue saying that if the police came to the hospital, bad things are going to happen to me. I kept petrified, I fear something that going to happen to my self or my family. When get out of the operating room, after talked with Mrs. Delgado, he passed in front of me with a furious face. I called the police and told them not to come to the hospital. I went to the police head quarter and filed a complaint. They gave me the complaint number but was too scared that I lost it. The next day I went to the hospital to inspect my lockers, and someone stole some

items from them (approximately $1,000.00 value). I was going to tell the administrator but I was afraid of what they gone to do to me or my relattives.

92. After I finished my work doing the revision of the blood utilization committee, and the administration refused to pay me for my work, as contracted with Dr. Cartagena, passed several days and he called me to his office at administration department, and with an angry attitude towar me gave me my check, and told me that I would not continue doing the work and the hospital had no other position to offer me. My relation with the hospital was finished.

93. Antitrust laws and Monopoly:

94. Individual hospitals and independent physicians and physician's practices, e.g., professional corporations, in any given specialty are viewed as competitors, each competing against the others for the healthcare dollars of patients, insurers, and other third-party payors, such as Medicare. Antitrust laws became of increasing concern when the development and growth of managed care led such otherwise competing healthcare providers to development and join both formal and informal networks.

95. As part of their efforts to manage healthcare and its cost, health plans (payors) began to move away from letting their insureds or "members" utilize any physician or hospital of their choice, and from paying those providers on the basis of the fees independently set by each provider. Instead, payors began to specify limited groups of "participating" hospital and physicians at which and from whom their members could receive care as a covered benefit. The payors also began to,

themselves, dictate in advance the fees and rates at which they would pay the participating providers for the care they furnished to plan members.

96. The Messenger Model Alternative to Jointly Negotiating Price Terms:

97. The messenger model was recognized in the Policy Statements as a tool through which provider networks might economically facilitate contracting with payors while avoiding price-fixing liability. The messenger models "can be organized and operated in a variety of ways," the two major varieties have become known as the "pure" and "modified" messenger models.

98. Under the pure messenger model, an independent third-party (the "messenger") serves as a mere conduit between the network's providers and payors. The messenger communicates a payor's offer to each of the individual providers and, in turns, conveys each provider's acceptance or rejection of the offer back to the payor.

99. Under the modified messenger model, the third-party messenger obtains from each providers the lowest price at which he will furnish services, and the provider's authorization to accept on his behalf payor offers that meet or exceed his price floor. The messenger must also forward to the provider for his individual consideration any offer that does not meet that floor. To facilitate contracting, the messenger may also prepare and share with potential payors, but not the network providers, an aggregation of the providers' price floors, from which the payor may ascertain the percentage of the network's members that would participate if offered a particular fee schedule or rate.

100. In Puerto Rico the elderly people have an Advantage Healthcare Insurance. Two Mayor hospitals have the mayority of hospitals in the Island. Metro Pavia (First **Medical), and Menonita Healthcare. Metro Pavia Health system, is the largest** hospital network in Puerto Rico, and the Caribbean; with more than twelve (12) hospitals, and affiliates. (Internet site). Menonita General Hospital have thirteen (13) hospitals.  Metro Pavia cover the metropolitan area, the north, west and south regions of Puerto Rico. The Menonita General Hospital cover all the central area, such as: Aibonito, Caguas, Cayey, Guayama, Humacao, CIMA Aibonito, Ponce, Aguas Buenas, Cidra, Coamo, Comerio, Yabucoa, and Culebra. (Internet site). Menonita Caguas, uses the modified messenger model. They contract with the Healt Insurance for a lower price, and contract young graduate physicians for the care of the health insurance agreement. They fixed prices, and only admit a lower amount of patients insured with that Health Plan. They paid the physician with a lower fee, and retain for the hospital the exceeding received. They, also, provide, to the contract physician with an office, nurses, and secretary personal, and all the equipment, furnitures, etc to run an offices. Also contract with General Physician, Hospitalist, family physicians, and other who they can control. Through the emergency room came a patient that must be admit to the hospital, but if they are from the arranged Insurances, they try to delay the admission, to evade it. If there are no possibility, then consult with the primary physicians to admit the patient to the Hospital, They managed the patient depending of the Insurance, and try to discharge home early or late. If need to consult a specialist, the patient continue under the service of the primary

physician, also they consult those specialist that the Hospital wanted to.These are the same as we stated before. The Healthcare Insurance, and the Hospital organizations, both want to profit. No payment or cost in the Healthcare policy benefits the patient. The cost of medicine and the Health. Insurers are getting high.

101."The Health System in Puerto Rico Profile" (January 2007, USAID Panamerican    Health Organization"

102. .According with the Puerto Rico Health System demonstrated the following:

103. Access problems, efficiency and equites to a Higher Health Lever.

104. The quality of curative and rehabilitation services, and those related to prevention Reflects reazonables doubts

105. Severely affected patient-physician relationship.

106.  Insatisfaction, from providers and beneficiaries of the government Health Plan.

107. Questioning of the cost efficiency, due to the fact that we are the first world country that invest in more resources in relation to PBN and our health results are below that of all comparables industrialized countries

108. Tort Law: A tort is an act or omission that gives rise to injury or harm to another and amounts to a civil wrong for which courts impose liability. There are numerous specific torts, including, AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. (Emphasis supplied).

109. Contracts:

110. A contract is an agreement between parties, creating mutual obligations that are enforceable by law. The basic elements required for the agreement to be a legally enforceable contract are: Mutual Assent, expressed by a valid Offer and Acceptance; adequate Consideration; Capacity; and Legality.

111. On Deccemberr 31, 2014, the Minnesota Supreme Court ruled that a hospital's medical staff had the capacity to sue and be sued, and that the medical staff bylaws can be considered a contract as between the medical personnel and the hospital. This rulling came from the case Medical Staff of Avera Marshall Regional Medical Center, et. al. V. Avera Marshall d/b/a Avera Marshall Regional Center, et. al;-N.W.2d- (Minn. 2014).

112. After finding that the medical staff had standing, the court then held that "[the hospital] offered privileges to each member of the medical staff, so long as the Medical Staff member agreed to be bound by the medical staff bylaws as a condition of appointment" and therefore, the two parties entered into a formal contract.

113. With this ruling, Minnesota is now a part of the majority of jurisdictions that recognize that medical staff bylaws are considered contracts- which is also the position of the American Medical Association.

114. The Minnesota Supreme Court held in Medical Staff of Avera MarshallRegional Medical Center v. Avera Marshall that medical staff bylaws constitute an enforceable contract between a hospital and its medical staff. Finding no

preexisting duties, the majority determined that medical staff bylaws hold sufficient consideration to create an enforceable contract.

115. Founded in 1943, the Association of American Physicians & Surgeons, Inc. is an association of thousands of physicians in virtually every specialty. Is dedicated to ethical standards in the practice of medicine, including the sanctity of the patient-physician relationssship. The Association has filed numerous "amicus curiae" briefs in noteworthy cases. [See. E.g., Springer v. Henry, 435 F. 3d 268, 271 (3dCir. 2006)]. The AAPS, argues that the issue transcends the relationship between the parties and instead impacts thousands of patients damaged as a result of hospital errors, incompetence, wrongdoing, and cover-ups. The Springer case arose from Delaware, and the U.S. Court of Appeals for the Third Circuit sided with the AAPS'; s position in its decision.

116. If ruling against that the medical staff bylaws do not constitute a contract, physicians and their patients lose essential protections against wrongful conduct, bad faith dealing, discrimination, and retaliation by administrators, medical director, governing body, and CEO, at hospitals as well as physicians who commit wrongdoing against other physicians for competitive advantage.By ruling against. The Court gives a blank check to the hospital setting for anyone to act wrongfully to destroy the career of a physician who is standing up for his patients or otherwise providing much-needed medical care to the public. Removing the restraints secured by medical staff bylaws will have an immense chilling effect against physicians who would otherwise stand up for their patients to obtain the care those patients need.

117. Medical staff bylaws must be accepted as contractually enforceable, or else they become a dead letter, with nothing to replace them. No meaningful accountability typically exists in a hospital setting other than that provided by medical staff bylaws, and if the Court ruling is in contrary, the decision would have a profoundly negative impact on the practice of medicine, and the availability of quality care to the public.

118. Medical staff bylaws are the necessary framework for ensuring accountability by all in a hospital setting. The Joint Commission, the leading accrediting body for hospitals, properly attaches much significance to the medical staff bylaws at a hospital. But if those bylaws are not contractually enforceable, then they become ineffective to safeguard against wrongful conduct such as discrimination or retaliation against physicians who stand up for patients or merely provide much-needed competition for the benefit of the consumers. Many states recognize that medical staff bylaws are contractually enforceable.

119. Courts in more than thirty states have held that the bylaws are a contract between the hospital and its physicians.

120. The medical staff bylaws are, according to the Medicare Conditions of Participation, by state statutes and by Joint Commission standards, the source of the hospital's policies and decisions on medical staff membership. Joint Commission standards prohibit either party from unilaterally amending them or passing conflicting bylaws or hospital policies.

121. Membership issues are at the heart of many clashes, as are credentialing, peer review and quality assurance. Only members of the medical staff are considered competent to make decisions about the quality of work of other physicians. Hospital administrators have been trying to limit physicians' self-governance for years, though, with the results that the Joint Commissionn standard for medical staff bylaws (MS 1.20), was revised in 2007, and any changes will only become effective in 2011. The 2007 version of (MS 1.20), which will be renumbered (MS 01.01.01), is thus still in effect. It mantains the power of the medical staff to govern itself and the right of physicians as opposed to administrator to make patient care decisions by describing in detail the requirements that must be in the medical staff bylaws.

122. More hospitals are adopting codes of conduct that confer the power to discipline physicians for "inappropriate behaviors" that have little to do with patient care, according to Elizabeth A. Snelson, Esq: who gave a presentation at the American Society of Anesthesiologists' Legislative Conference on May 5, 2009. Clauses in some of these codes of conduct are designed to help the hospital perform economic credentialing or to rid itsel of physicians who fall out of favor with other clinical personnel or with administrative staff.

123. The Joint commission recommends that code of conduct contain, among other things, "Specifics regarding how and when to begin disciplinary actions (such as suspension, termination, loss of clinical privileges, reports to profesional licensure bodies)." In this respect the codes can become just as important to a physician's standing as the medical staff bylaws. Partly because of the

vulnerability of physicians to retaliation or to a loss of privileges for anti-competitive reasons under a disciplinary system where decisions can be made by hospital; executives for economic and not patient care reasons. The AMA in conjunction with The Joint Commission and other organizations develop a model appeals process and definition of disruptive behavior by a physician that "would rise to the level of true abusive behavior."

124. Ms. Snelson advises physicians to seek a single, exclusive code of conduct that applies exclusively to the medical staff and that is included in the medical staff bylaws. This physicians' code of conduct should be integrated with the medical staff peer review process. It should provide for diversion to a specific medical staff wellness program for disruptive conduct that may have a health-related cause.

125. The Joint Commission is looking for definitions of "appropriate care" in the medical staff bylaws. All forms of "advocating for patients" should be covered, including filing complaints about the conduct of clinical staff and administrative personnel as well as other criticism intended to stop poor patient care.

126. Causes of Misalignment between physicians and boards of trustees. [Board Brief, prepared for Colorado Hospital Association Trustees, 2014], "Building Constructive Hospital/ Physician Relationships and Alignment" (pages #4, #5). (Exhibit #32) two pages.

127. Report of the Council on Medical Service: CMS Report 4, November, 2020. Presented by: Lynda M. Young, MD, Chair AMA (Resolution 718-A-19).

128. Resolution 718 asked that our American Medical Association (AMA) actively oppose policies that limit a physician's access to hospital services based on the number of referrals made, the number of procedures performed, the use of any and all hospital services or employment affliliation.

129. Relationships between hospitals and physicians have changed over the years as health care payment and delivery systems have evolved, more care has moved to outpatient settings, and physician practice ownership has shifted away from physician-owned practice and toward working for a hospital or hospital-owned practice. The shift toward hospital employment is evidenced by AMA's Physician Practice Benchmark Surveys, which show that 35% of physicians worked either directly for a hospital or in a practice at least partially owned by a hospital in 2018, up from 29% in 2012.

130. Hospital care has similarly evolved over time, such that inpatients are now sicker, hospital stays are shorter, and the hospitalist model—which was introduced in the 1990s—is in place in a majority of hospitals. Although primary care physicians and other generalist physicians still serve as inpatient attendings, far fewer specialists do so, and most inpatient care is managed by hospitalists. Prior to these shifts and the advent of hospital medicine, physicians largely practiced independently and managed patient care across outpatient and inpatient settings. Although many private practice physicians

remain members of hospital medical staffs and have clinical privileges, most hspitals (approximately 75% in 2016) utilize hospitalists.

131. Recently, concerns have been raised in the House of Delegates regarding hospital-physician relationships and hospitals giving preference to their employed physicians to the detriment of private practice physicians and patient-physicians relationships. Referred Resolution 718-A-19 focuses specifically on concerns regarding hospitals using case and volume metrics to limit access to hospital services by private practice physicians who are on staff.

132. Clinical privileges means the permission granted to medical staff members to provide patient care and includes unrestricted access to hospital resources (including equipment, facilities and hospital personnel) which are necessary to effectively exercise those privileges.

133. In addition to defining clinical privileges and addressing access to hospital resources, Policy H-230.982 states that privileges can be abridged only upon recommendation of the medical staff for reasons related to professional competence, adherence to appropriate standards of medical care, health status, or other parameters agreed upon by the medical staff. Policy H-230.987 supports the concept that individual medical staff members who have been granted clinical privileges are entitled to full due process in any attempt to abridge those privileges by granting exclusive contracts by the hospital governing body.

134. Policy H-285.964 states that hospitalist programs should be developed consistent with AMA policy on medical staff bylaws and implemented with the formal approval of the organized medical staff, and that hospitals and other health care organizations should not compel physicians by contractual obligation to assign their patients to hospitalists. This policy also opposes any hospitalist model that disrupts patient/physician relationships or continuity of care and jeopardizes the integrity of inpatient privileges of attending physicians and physician consultants.

135. Intentional Infliction of Emotional and Mental Distress:

   1.) The defendant's conduct is outrageous

   2.) Defamation

   3.) Actual malice

   4.) We are acting under civility rules

   5.) Incitement to violence

   6.) Obscenity

   7.) Criminal conduct

   8.) Strong external indicia to be harm

   9.) Producing Emotional and Mental Distress, harms.

136. MEDICAL STAFF BYLAWS (Hospital Menonita Caguas): [proof of no due process, and others]:[1],[2]

137. Article II Definitions:

138. (2.1) Administrator: Person appointed by the CEO to act on its behalf.[3]

139. (2.3) Adverse Action.: Action to RESTRICT, SUSPEND, REVOKE, DENY or not renew a PRACTITIONER'S ....CLINICAL PRIVILEGES, that is TAKEN or MADE in the course of a PROFESSIONAL REVIEW ACTIVITY and is BASED on an EVALUATION of the PRACTTITIONER'S CLINICAL COMPETENCE......[4]

140. (2.11) CEO: Person appointed by the Governing Body of Mennonite General Hospital, Inc. responsible for overseeing all ADMINISTRATIVE COORPORATE MATTERS of MGHI and MGHI Group, including Hospital Menonita Caguas, Inc.

141. (2.13) Clinical Privileges: Authorization granted by the GB to an individual (sic) to provide specific patient care services in the Hospital within limits, based on...license, education, training, experience, competence, health status, judgement, individual character, and performance. Privileges shall be based on

---

[1] I want to expose the entanglement and accountability of the medical staff bylaws.
[2] First of all, the Medical Staff Bylaws was adopted on May 23, 2017. I WAS AN Active member of the Medical Staff, but had no participation in elaborating it. It was approved by the Governing Body on DECEMBER 7, 2017.
[3] Administrator is appointed by the CEO to act on its behalf.
[4] Although automatic suspension has an extent issues, including automatic removal of my membership, it also apply to me because the withdrawal of my Clinical Privileges for issues related to any act or omission from the Practitioner that is administrative in nature. The administration wanted to replace me with new Young graduate surgeons.

consideration of the Hospital's Capacity and capability to deliver care, treatment, and services within a specified setting.[5]

142. (2.22) Focused Professional Practice Evaluation (FPPE): Medical Staff defined time limited process of the Medical Staff whereby the privilege/procedure-specific competence a Practitioner WHOSE NOT HAVE DOCUMENTED EVIDENCE OF COMPETETNTLY PERFORMING THE REQUESTED PRIVILEGE AT HOSPITAL is evaluated. A FPPE may be conducted when a question arise regarding a CURRENTLY PRIVILEGED PRACTITIONER'S ABILITY TO PROVIDE, safe, high-quality patient care. The information used in the FPPE may be acquired through, periodic chart review, direct observation, monitoring of diagnostic and treatment techniques and patterns.

143. (2.29) Hospitalist: A physician who assumes responsibility for the GENERAL care of Hospitalized patients and returns them to the care of their Primary Care Physician when they are discharged from the Hospital.[6]

144. (2.34) Medical Director: Practitioner employed by the Hospital, whose duties are administrative and clinical in nature. Clinical responsibilities are to require judgement to patient care and include the supervision of professional activities

---

[5] Hospital menonita Caguas has not enough bed capacity, no operating rooms facilities to accommodate all the surgeons available now, and the others they are contracting. Other must impotant factor is the Nurse-to-patient ratio. In an artcle published last March 12, 2019 by King University, they stated that the standar is one (1) nurse for every five (5) patients on average in medical-surgical units. In menonita hospital Caguas, we have one (1) nurse for every twent five (25) patients (in the surgery ward).They could experience a phenomenon known as nurse burnout. In 2018, 62% of nurses felt burnout, according to the RN Network (Cornwall, 2018). The quality of patient care decreases as the number of patients in a nurse care increases. A study published in the New England Journal of Medicine found tha unsafe staffing levels were "associated with increased mortality" for patients (Needleman et al., 2011).
[6] Article 2.49, Primary care physician: Physician, such as hospitalist, is responsible to provide the patient continuos medical care. May have admitting privileges at the hospital.

of the medical staff. Administrative duties are the same as above, to enforce medical staff policies. The Medical Director reports to the CEO and to the hospital administrator[7].

145. (2.35) Medical Executive Committee: MEC of the Medical Staff is the rimary governance committee for the Medical Staff. The MEC makes decisions related to Medical Staff policies, procedures, and rules, with quality control and improvement. They are also responsible for creating Medical Staff Appoinment aand Reappointment criteria.

146. (2.36) Medical Staff: Practitioners designated by the GB to be eligible for Medical Staff Membership and who are credentialed and privileged to provide professional healthcare services. The GB have been granted Clinical Privileges to admit/attend patients at the Hospital. THE MEDICAL STAFF IS AN INTEGRAL PART OF THE HOSPITAL AND IS NOT A SEPARATE LEGAL ENTITY[8].

147. (2.37) Medical Staff Organized:  Organized body who, as a group, are responsible for establishing the Bylaws and Rules and Regulations, and Policies for the Medical Staff. Is limited to the members in the Active Category of Membership who granted the right to vote, to be members of Committees and to hold office.

---

[7] Please see paragraphs 131-134
[8] Please see Paragraphs:66-74, 75(1), 78(2), 80(4), 81(5).

148. (2.41) Mennonite General Hospital, Inc. (MGHI); MGHI Group: NOT FOR PROFIT, IS THE SOLE CORPORATE Member of Hospital Menonita Caguas, Inc., and Plan de Salud Menonita, Inc.

149. (2.42) Ongoing Professional Practice Evaluation (OPPE): Continuous evaluation of the Practitioner's professional performance, rather than an episodic evaluation. It is intended to identify and resolve potential performance issues as soon as possible. Serve as a tool for Medical Staff for determinations related to reappointment or to revise or revoke existing Clinical Privileges.[9]

150. (2.46) Peer: Members of the Medical Staff that have equal standing as far as Clinical Privileges. Includes all practitioners practicing in the same field, specialty and/or sub-specialty, which have equal training and/or background as other members of the Medical Staff who are similarly situated.[10]

151. (2.47) Peer Review: Process of evaluating the quality of patient care practices or services ordered or performed by health care Practitioners, measured against objective criteria which define acceptable and adequate practice through an evaluation performed through formally adopted written procedures which PROVIDE FOR ADEQUATE NOTICE AND OPPORTUNITY FOR A HEARING. Also it is part of a Professional Review Activity[11].

---

[9] They never did this to me. It was a direct order by Dr. Cartagena to curtail my privileges acting on behalf of the CEO, Administrator, and GB.

[10] No one of my PEERs have the same background, knowledge, skills, judgement, and procedures done as I have.

[11] Dr. Cartagena, The CEO, GB, administrator, HGMI, HMCI, Dr. Eric Perez, acting as President of the Medical Staff.None of them requested this procedure.

152. (253) Precautionary Suspension: Removal from Medical Staff Membership and withdrawal of a Practitioner's Clinical Privileges for causes related to issues concerning quality of care. Precautionary suspensions of clinical privileges may be partial. Precauttionary suspensions shall be IMPOSED TAKING INTO CONSIDERATION THE DUE PROCESS AND FAIR HEARING AND APPEAL PROCEDURES ESTABLISHED IN THESE BYLAWS.[12]

153. (2.60) Provisional Appoinment: The period of initial appointment of a practitioner to the hospital's medical staff, which includes the granting of Clinical Privileges. This appointment usually last for a twelve (12) months period, or more.

154. (4.1.2) No automatic entitlement to Membership: Applicants shall not be entitled membership (Appointment or Reappointment) to the Medical Staff or to exercise a particular Clinical Privileges at the hospital merely of the fact that they had in the past or presently have such Clinical Privileges at another Hospital, and licensed.

155. (4.1.3) Hospital needs and ability to accommodate: Clinical Privileges shall be granted only for the provision of care that is within the scope of services, capacity, capabilities, and business plan of the Hospital. Before granting Clinical Privileges, a review must occur in order to determine whether the resources necessary to support the privileges are currently available, or will be available within a specified time frame. The resources to be considered shall

---

[12] Never gave me or oriented about a DUE PROCESS, NOR A HEARING.

include whether there is sufficient space, equipment, staffing, financial resources or other necessary resources to support each requested privilege and the readiness of the services that the professional can make available to the patients[13]

156. (4.1.4) Non Discrimination: The Medical Staff Membership and/or Clinical Privileges shall not be denied on basis of…, AGE….

157. (4.4) General Obligations of Practitioners: To fulfill the following obligations:

158. (4.4.3) Adhere to standards of Medical Ethics (e.g., the Principles of Medical Ethics of the American Medical Association.

---

[13] The hospital lack of beds availability, the ratio from nurse-to-patients is below the acceptable range. The operating room only have six (6) general operating rooms to perform procedures, the other room is an endoscopic suite. There are only two anesthesiologist to engage in the process of give the anesthesia to all six rooms, and occasionally going to an emergency at delivery room at another level of the hospital. The utilization of operating rooms are heavy work to all of us that uses theses rooms, crowded. Somes have to wait until one room is available, mostly during PM. Frequently the schedule of the day is heavy, and there are still patients pending to get to surgery late in the night. I saw several times one of the anesthesiologist sleeping above his deck in his offices, burnout, waiting to finish one surgery, and to start another. The personnel get stressed, long absence due to burnout; the equipment that I almost used were broken, not functioning adequately. That causes prolongation of the surgery procedure. The last Laparoscopy I performed the last year (2022) I had the gallbladder almost to be removed, but the new instrument they gave to me were damaged (news) I had to use three of them, and always made a claim to the head nurse and the supervisor Ms. Delgado.I have witness.Other day I was doing a colon surgery but the instrument I needed to made the procedure were not available. I had to sew the bowel old time. No complications to the patient, but if the surgeon does not know how to fix it, the patient may had a prolonged period of time until they get a surgeon with that knowledge or get the instrument from another hospital. The hospital have suction machines that do not work, many of the operating room instrument are useless. They are news but with many malfunction. I complain to the vendor and made an example to him, and the instrument did not work. They told me that we had to use it because is cheaper. Due to the above mentioned, how the hospital replaced me with three young surgeons. I know because I am old, and they wanted to increases their profit. Passing over the Medical Staff Bylaws, and with no DUE process.

159. (4.4.4) Provide CONTINUOUS CARE to his patients at the generally recognized professional level of quality and efficiency established by hospital menonita Caguas.[14]

160. (4.4.6) Delegate in his absence, the responsibility for diagnosis and/or care of his patients only to a Practitioner who is a Member in Good Standing of the medical staff with equivalent training and clinical privileges.[15]

161. (4.4.12) PARTICIPATE IN EMERGENCY SERVICE COVERAGE (ON CALL DUTY ROSTER) AND CONSULTATION PANELS as may be required by law and/or hospital menota Caguas policies and abide to all applicable local and federal laws and regulation governing the rendering of emergency care.[16]

162. (4.4.15) Refrain from any unlawful harassment or discrimination against any person (including patients, hospital's employees, or visitors) on the basis of…AGE….[17]

163. (4.4.20) Refrain from unlawful fee splitting or unlawful inducements involving its fiscal responsibilities and policies, including those relating to payment or reimbursement by governmental and third party payers.[18]

---

[14] Dr. Cartagena, as a pneumology physician, and during his roster coverage, do not pass rounds to his critical ill patients during weekend, and holidays.
[15] Id.
[16] Dr. Cartagena on behalf of the Ceo, and GB of the hospital removed me from this OBLIGATION. Due to AGE discrimination, and to fulfill their agenda for profit.
[17] Id.
[18] They are using this scheme, at least with the new Young surgeons.

164. (4.4.24) promptly respond to on-call duty requests for in-person appearance to evaluate and treat a patient within the timeframes established by the hospital and thhe MEC.

165. (4.6) Conditions and durations of appointment:

166. (4.6.1) Appoinment/Reappoinment Recommendation: Initial appointment and reappoinmet to the medical staff shall be made by the GB, after there has been a recommendation from the medical staff.

167. (4.6.2) Duration of Initial Appointmment: shall be on a PROVISIONAL basis for a period of TWELVE (12) MONTHS.

168. (4.6.3) Duration of Reappoinment: shall be for a period of twenty four (24) months. The Clinical Privileges shall not exceed twenty four (24) months.

169. (4.7.1) Nature of the relationship: In spite of the contract that the applicant/practitioner may have with hospital menonita Caguas, every practitioner that render medical services at the hospital, or uses its resources, must have a Medical Staff Appoinment and Clinical Privileges.

170. (5.1.1) Categories of the medical staff: 1) provisional staff: twelve (12) months, 2) Associate Staff: twelve (12) months, 3) Active staff: twenty four (24) months.

171. (5.1.2) Recommendations for category: The chair of the Department will make recommendations of each of the members of his Department to any of the

categories of the Medical Staff. Said recommendation shall be endorsed by the MEC before it is sent to the GB for its approval.

172. (5.2) Provisional Staff: All provisional appointments to the Staff shall be Provisional for a period of twelve (12) months. Are subject to the following:

173. (5.2.2) shall be assigned to a Department. THE CHAIR OF THE DEPARTMENT TO WHICH A NEWLY APPOINTED STAFF MEMBER IS ASSIGNED, SHALL IMPLEMENT A MONITORING PROTOCOL FOR OBSERVATION AND REVIEW OF THE PERFORMANCE OF SUCH STAFF MEMBER TO DETERMINE THE ELIGIBILITY OF SUCH PROVISIONAL MEMBER FOR REGULAR STAFF MEMBERSHIP.and for exercising the Clinical Privileges Provisionally granted to him

174. (5.2..4) At the end of the Provisional period, the MEC upon the written recommendation of the President of the Medical Staff and the Chair of the Department to which the practitioner was assigned, may recommend to the GB any of the following: [ 5.2.4.1-5.2.4.3.]

175. (5.3) Associate Staff: Practitioners who meet the general qualifications stated in these Bylaws and have satisfactorily completed the Provisional Appointment. After completing the Provisional Appointment, every Practitioner, will be appointed to the Associate Medical Staff, for one (1) year before being appointed to any other Medical Staff Category.THE ASSOCIATE MEDICAL STAFF MEMBER MAY BE SUBJECT TO PROCTORING.

176. (5.3.1) Prerogatives of the Associate Staf: {5.3.1.1} Admit patients, without limitation, {5.3.1.4} Participate in the Emergency Room Department "on-call" duty roster.[19]

177. (5.4) Active Staff: Practitioners who have served for two (2) years on the medical staff, shall be eligible to apply for appointment to the Active Staff

178. (5.4.2) Prerogatives: Shall be entitled:

179. (5.4.2.1) to admit patients and/or answer consults without limitation.[20]

180. (5.4.2.5) to have priority on bed availability, operating room time and facilities on elective patients, over any Member under any other category of the medical staff.[21]

181. (5.4.3.1) each member of the Active Staff shall: Discharge the basic responsibilities set forth Article III of these Bylaws, including being available for "on-call" duty for the EmergencyRoom and to answer consultations from other Departments, units or Section of the hospital.

182. (7.21.11) The GB's decision and notice to appoint shall include (in reappointment):

183. (7.21.11.3) The Clinical Privileges he may exercise. The Practitioner shall only perform those Privileges granted by the GB.

---

[19] The three young graduate surgeons were doing admissions without limitations, and participating in the on-call roster in violation of the medical staff bylaws, and with the approval of the medical director, the CEO, GB.

[20] This apply only to the Active Staff, but the three young graduate surgeons had theses privileges when they would be in the Provisional staff without theses privileges, and subject to proctoring.

[21] The three young surgeons started with Active Medical Staff without passing through the Provisional staff and associated staff. By orders of the Medical Director, CEO, GB, and the President of the Medical Staff, and the MEC.

184. (7.21.12) The President of the GB may appoint Medical Affairs Committee to act in its behalf to evaluate Reappointments and/or the re-granting/reappraisal of Privileges recommended by the MEC. If the three (3) members of the Committee of Medical Affairs of the GB denied the application, the matter will be considered in a plenary session of the GB.[22]

185. (9.1) COLLEGIAL INTERVENTION: prior to initiating a corrective action against a Practitioner, the Medical Staff leader or GB (through the CEO or his Designee) may attempt to resolve the concern informally.[23] . THE PROCESS TO BE FOLLOW IS (9.1.1) [1] (9.1.1.1) = Meet with the Medical Director. If he is unable to resolve the issue, the matter should be forwarded to the Department Chair. [2] (9.1.1.2)= if the matter is unable to resolve with the Department Chair, should be forwarded to the President of the Medical Staff, and/or a designated ad hoc Medical Staff committee. [3] (9.1.1.3)= If the President of the Medical Staff, the Department Chair, and/or the ad hoc Medical Staff Committee are unable to resolve the issue, the matter should be referred to the MEC for the initation of a formal corrective action.[24]

186. (9.2) the Hospital, Medical Director, President of the Medical Staff, GB, CEO, nobody sent me a CORRECTIVE ACTION; INVESTIGATION.

---

[22] Please refers to paragraphs 118-123.

[23] I was the one that requested a Collegial Intervention due to my discrimination for AGE, and CURTAILING MY CLINICAL PRIVILEGES

[24] I tried to follow all the Collegial Intervention Procedures to resolve the concern informally, but they denied me all of them. My letters to the Medical Staff President regarding the intervention are in my exhibits.

187. ARTICLE XXII: (22.1) The Medical Staff Bylaws shall be ENACTED AND BECOME EFFECTIVE ONCE APPPROVED BY THE GB OF THE HOSPITAL. THEY SHALL BE, WHEN ADOPTED AND APPROVED, <u>EQUALLY BINDING TO THE GB AND THE STAFF AND FUNCTION AS A FORMAL AGREEMENT BETWEEN BOTH PARTIES.</u>

## REQUEST FOR RELIEF

Because what I am saying in my complaints, and the proof that I am showing throughout the exhibits and qoutations related, and what we are going to know through the discovery process and trial, I proof that the defendants were acting to get rid me out of the hospital. Starting with AGE DISCRIMINATION, which I already proof. Breach of contracts due to no hearing, no due process regarding curtailing my privileges, without any justifiable reason, except my AGE; case I already proof. Breach of contract between Dr. Cartagena and Mr. Rogelio Diaz MHSA, Medical Director and Administrator of hospital menonita Caguas, inc., when wee agree the terms, and conditions of my contract to start as Staff Member of such hospital with monthly surgery on-call duties, acting on behalf of GB, CEO, and the Hospital Mennonite Caguas, Inc., and MGHI, and MGHI Group.. Medical Staff controversy between Bylaws and GB. Violation of Federal Trade Commission, Monopoly, Kick-back, defamation, libel, forgery.

With my ongoing surgery practice at Hospital Menonita Caguas, Inc and my on-call duties growing, I predicted an earning of approximately three hundred thousands ($300,000.00) dollars revenue yearly; for a duration of ten (10) years when I retire, It must be Three millions ($3,000,000.00), plus taxes one million, eight hundred ($1,800, 000.00) dollards; For loss of income. Plus three millions ($3,000,000.00) dollars for emotional, mental distress and harm, and fourth millions ($4,000,000.00) dollars for defamation, libel, against my untachable reputation as person and as a surgeon. My wife reclaim three millions ($3,000,000.00) dollars for emotional, mental distress and harms; and two millions five hundred ($2,500,000.00) dollars for quality of life and loss of income. The total will be: seventeen millions, eight hundred thousand ($17,800,000.00) dollars.

Demand for Jury Trial: Plaintiff hreby requests a jury trial on all issues raised in this complaint.

Dated: FEBRUARY 10, 2023

Eduardo Ramirez-Lizardi

Plaintiff in Pro Se

54